[Cite as *State v. Brown*, 2023-Ohio-645.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29553 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 01036 |
| | : | |
| CHRISTOPHER DEANGELO BROWN | : | (Criminal Appeal from Common Pleas Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 3, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by RICKY L. MURRAY, Attorney for Appellee

MICHAEL J. SCARPELLI, Attorney for Appellant

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Christopher Deangelo Brown appeals from his conviction for robbery. Brown asserts the State did not present evidence sufficient to sustain the conviction and that the conviction was against the manifest weight of the evidence. For the reasons set forth below, the judgment of the trial court is affirmed.

## I.     Facts and Procedural Background

{¶ 2} In April 2022, Amber Kilgore and her fiancé Michael Santana were residing in a homeless shelter located on Apple Street in Dayton.   During the late night and early morning hours of April 7 and 8, 2022, Kilgore and Santana left the shelter and walked to visit two friends who were living in an abandoned parking garage in downtown Dayton. Upon arriving at the garage, Kilgore and Santana walked up a ramp to the sixth floor, where their friends were camped.   The foursome played cards and listened to music. Later, Kilgore and Santana got into an argument and walked to the ground floor of the garage.   Santana, who had possession of Kilgore's cell phone, left and walked down the street.   Kilgore waited approximately 20 minutes before she walked back up the ramp to her friends' camp.   Kilgore called out to her friends but received no response.   Believing her friends to be asleep, Kilgore began walking back down the ramp.

{¶ 3} When Kilgore reached the third floor of the garage, she noted a man holding a coffee cup.   The man, using a "commanding" or "threatening" tone, told her to "come over here."   Tr. p. 127.   The man told Kilgore that he "owned" the garage, that she was "disrespectful," and that he would "teach [her] a lesson."   *Id.*   Kilgore continued to walk down the ramp, and the man started walking beside her.   During the walk, he continued to call her disrespectful.

{¶ 4} Once the pair reached the ground floor, the man ordered Kilgore to go into the garage ticket booth.   Kilgore tried to walk around the man, but he blocked her from exiting the garage.   The man then grabbed Kilgore's purse and began hitting her about

the head. Eventually, Kilgore fell to the floor, and the man began to kick her while still trying to pull the purse away. Finally, the man gave a hard tug and Kilgore released the purse. The man stumbled backward, and Kilgore fled the garage.

{¶ 5} Kilgore ran back to the homeless shelter and banged on the glass door, seeking entry. A security guard, Chris Schwieterman, unlocked the door and admitted Kilgore into the building. Schwieterman, who stated that Kilgore looked frantic and scared, escorted her into an office where she related the attack to him. Kilgore then used the office phone to call Santana, who advised her to call the police. Kilgore then called the police and reported the attack.

{¶ 6} In the meantime, Schwieterman contacted another security officer and related information about the attack and a description of the suspect. The officer, Nicholas Reed, was on patrol at the time. Reed traveled to the parking garage, where he observed an individual matching the description relayed to him by Schwieterman. Reed drove his vehicle ahead of the man and pulled to the side of the road. He then observed the man brandish an item that appeared to be a gun. The man looked at Reed and asked, "what the f**k are you going to do?" Reed then drove around the corner, where he spotted two Dayton Police Department Officers. Reed informed the officers of his interaction with the suspect and requested the officers accompany him to the garage.

{¶ 7} Around the same time, Santana flagged down Dayton Police Department patrol officer Joshua Blankley. Santana stated that he had made an emergency call regarding an attack involving his fiancée. While Blankley was speaking with Santana, he overheard a radio dispatch concerning an armed suspect located at the abandoned

garage.

**{¶ 8}** Blankley then met the other two officers and Reed at the garage.   The group observed a light turn off in the ticket booth.   The officers eventually removed a man, later identified as Brown, from the booth.   The officers recovered Kilgore's purse which still contained her identification.   The officers also discovered a metal barbell which Brown stated he carried for protection.

**{¶ 9}** Brown was indicted on one count of robbery (physical harm) in violation of R.C. 2911.01(A)(2), a felony of the second degree.   Following a jury trial, he was convicted as charged.   The trial court sentenced him to a prison term of five to seven and one-half years.   Brown appeals.

## II.     The Conviction is Supported by the Evidence

**{¶ 10}** Brown asserts the following for his first and second assignments of error:

THE JURY'S VERDICT IS NOT SUPPORTED BY SUFFICIENT EVIDENCE

THE JURY'S VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

**{¶ 11}** Brown claims the evidence presented by the State did not support the conviction for robbery.   Brown argues the evidence provided by the State's witnesses was not credible because of a discrepancy between descriptions provided by the witnesses regarding the hat worn by the perpetrator on the night of the offense. Specifically, he notes that Schwieterman described the hat as a beanie, while Santana

described it as a cowboy hat. He further notes Kilgore testified at trial and described the hat as a trucker hat.

{¶ 12} A sufficiency of the evidence analysis focuses upon whether the State presented adequate evidence, viewing such evidence in the light most favorable to the State, to allow the conviction to stand. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The State has presented sufficient evidence when "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Radford*, 2d Dist. Clark No. 2016-CA-80, 2017-Ohio-8189, ¶ 14, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 13} A manifest weight analysis, in contrast, requires an appellate court to review the record, weigh the evidence and any reasonable inferences allowed by the evidence, to consider witness credibility, and to determine whether the trier of fact, in resolving any evidentiary conflicts, "clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered." *Radford* at ¶ 15. Though involving different legal concepts, if the verdict is supported by the weight of the evidence, the evidence, by necessity, is legally sufficient. *Id.* at ¶ 16.

{¶ 14} Robbery is proscribed by R.C. 2911.02(A)(2), which states that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another[.]"

{¶ 15} At trial, Kilgore testified to the events set forth above. Specifically, she

testified Brown hit her repeatedly while pulling her purse away from her. Kilgore further testified that she suffered cuts and bruises from the attack and that she had to go to the hospital because she experienced severe pain in her rib area. Finally, Kilgore made an in-court identification of Brown as her assailant.

{¶ 16} Kilgore's testimony, which was believed by the jury, was sufficient to sustain the conviction. Additionally, the evidence demonstrated that Brown was located by officers in the ticket booth of the abandoned garage where Kilgore's purse was subsequently found. Based upon this record, we conclude the State presented competent, credible evidence upon which a reasonable juror could rely in finding the elements of the offense were proven.

{¶ 17} Further, the jury was made aware of the differing descriptions of the hat worn by the offender. We cannot say that the testimony of any of the witnesses was rendered inherently incredible because of the differing descriptions.

{¶ 18} " '[T]he trier of fact is better situated than an appellate court to view witnesses and to observe their demeanor, gestures, voice inflections and to use those observations in weighing credibility.' " *State v. Jackson*, 2015-Ohio-5490, 63 N.E.3d 410, ¶ 50 (2d Dist.), citing *State v. Lewis*, 4th Dist. Scioto No. 01CA2787, 2002 WL 368625 (Feb. 25, 2002). Thus, we must give substantial deference to the jury, which had the opportunity to see and hear the witnesses. We find nothing in the record from which to conclude that the jury patently lost its way in finding the victim and other State's witnesses to be credible.

{¶ 19} We cannot conclude that the jury, as the trier of fact, clearly lost its way,

and, by doing so, created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. Further, we conclude that the record contains evidence sufficient to sustain the conviction.

{¶ 20} Accordingly, the first and second assignments of error are overruled.

### III. Conclusion

{¶ 21} Both of Brown's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.